FILED
2017 Nov-03  PM 04:26
U.S. DISTRICT COURT
N.D. OF ALABAMA



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

KENNETH COOPER,                    )
                                   )
        Plaintiff,                 )
                                   )        CIVIL ACTION NO:
v.                                 )        CV-17
                                   )        JURY DEMAND
                                   )
NORFOLK SOUTHERN                   )
CORPORATION, Operating             )
Subsidiary NORFOLK SOUTHERN        )
RAILWAY COMPANY,                   )
                                   )
        Defendant.                 )

## COMPLAINT

## I.    *NATURE OF COMPLAINT*

1.    This action is brought by Kenneth Cooper ("Cooper" or "Plaintiff"), African-American male, a retired, former employee of Norfolk Southern Corporation operating subsidiary Norfolk Southern Railway Company ("Norfolk" or "Defendant").  Plaintiff brings his claims arising from his employment at the defendant's Birmingham, Alabama location.

2.    Plaintiff seeks a declaratory judgment that defendant has engaged in a pattern and practice of race discrimination along with retaliation in employment opportunities by disciplining the plaintiff, demoting the plaintiff, which caused a pay

reduction, and such conduct is unlawful under two statutes: (a) Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. §§2000e, *et seq.*, and (b) Section One of the Civil Rights Act of 1866, as amended in 1991, 42 U.S.C. §1981a.  Plaintiff also seeks a permanent injunction and other equitable relief necessary to eliminate the effects of defendant's past and present race discrimination and prevent such discrimination from continuing to adversely affect his life and career, including, but not limited to, affirmative restructuring the terms and conditions of employment, reimbursement of expenses incurred in prosecuting this action, and attorneys' fees.  Plaintiff further seeks damages, back-pay and other equitable remedies necessary to make himself whole.

## II.   *JURISDICTION AND VENUE*

3.    This Court has jurisdiction pursuant to 28 U.S.C. §§1331, 1343(4), and Title VII of the 1964 Civil Rights Act, as amended by the Civil Rights Act of 1991, 42 U.S.C. §§2000e, *et seq.*, as amended and 42 U.S.C. §1981; and, by the Federal Rail Safety Act ("FRSA"), 49 U.S.C. § 20109; and, 29 C.F.R. § 1982.

4.    This Court has federal question subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 because the cause of action at issue is authorized to be filed in the U.S. District Court by the Federal Rail Safety Act, 49 U.S.C. §20109(d)(3) ("FRSA").

5.     Venue is proper in this division and district pursuant to 28 U.S.C. §1391(b)(1),(c)(2),(d) because NS resides in this division and district. Venue is also proper in this Court pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this division and district.

## III.   CONDITIONS PRECEDENT TO SUIT UNDER TITLE VII

6.     The Plaintiff has fulfilled all precedent conditions necessary to the institution of this action under Title VII, specifically the plaintiff has filed his lawsuit within 90 days of receipt of his Dismissal and Notice of Rights from the EEOC. Plaintiff's claims arising under 42 U.S.C. §1981 do not require administrative exhaustion.

7.     Plaintiff timely filed a FRSA complaint with the Regional Administrator of Occupational Safety & Health Administration ("OSHA") pursuant to §20109 of the FRSA and 29 C.F.R. Part 1982.

8.     The Secretary of Labor had not issued a final decision by October 13, 2016, which was the 210th day following the filing of Plaintiff's complaint.

9.     As of the date of this Complaint, OSHA Regional Administrator has not entered any findings regarding the FRSA violation.

10.     As of the date of the filing of this complaint, the Secretary of Labor has still not issued a final decision. None of the delay is attributable to Plaintiff. **IV.**

3

## IV.   *PARTIES*

### A.   *Defendant*

11.     Defendant, Norfolk Southern Corporation operating subsidiary Norfolk Southern Railway Company, is an entity doing business in the State of Alabama.  The defendant is an employer as defined by 42 U.S.C. §2000e(b).  Defendant is also subject to suit under 42 U.S.C. §1981, as amended.  Defendant maintains either actual or constructive control, oversight, or direction over the operation.

12.     Norfolk is a transportation company in the business of hauling freight by rail.  Norfolk employees approximately 29,000 people and operates over 20,000 route miles in 22 states and the District of Columbia.  Headquartered in Norfolk, Virginia, Norfolk serves every major container port in the eastern United States and operates the most extensive intermodal network in the East.

### B.   *Plaintiff*

13.     Plaintiff, Kenneth Cooper, an African-American male, resident of the State of Alabama and a citizen of the United States.  At all times relevant to this lawsuit, Cooper was employed by the defendant at its Birmingham, Alabama location.

4

## V.  *CAUSES OF ACTION*

### *A.*  <u>Violations under Federal Rail Safety Act, 49 U.S.C. § 20109 ("FRSA")</u>

14.   Norfolk is a common carrier by railroad engaged in the transportation of freight for hire in interstate commerce.

15.   Plaintiff was at all times material to this Complaint, employed by Norfolk as a carman and a carman gang leader in the Defendant's Mechanical Department at its Norris Yard, Irondale, Alabama location.  Plaintiff became the first shift rip track gang leader in about 2014.

16.   Defendant's Mechanical Department is responsible for inspecting and repairing freight cars and performing certain train air brake test on freight cars and freight trains as they come into, and leave, Norris Yard.

17.   Trains come into a receiving yard, where carmen the Mechanical Department walk the trains doing inspections and bleeding the air from the car's air brake system. The cars are then shoved over the "hump" into the 45(+) track classification yard, the cars going to particular tracks depending on destination.

18.   After classification cars are pulled form certain tracks and taken to one of two departure yards where they are built into trains. Carmen inspect the newly built traiNorfolk for federal standards and other defects and perform federally required air

5

brake tests. If a defect is found the carman puts a "bad order" tag on the car which lists the defect(s).

19.     If the "bad order" cannot be repaired with the car in the train, the "bad order" car must be switched out of the train and sent to the Car Repair Shop, or rip track.

20.     The rip track is the car repair facility and carmen perform car repairs there. After repair such cars are released to the Transportation Department and put back in service.

21.     Freight cars from many railroads and private owners move on the United States general rail system. If a "foreign", or non-Norfolk owned, or private owner car needs repair at Norris Yard, whether in the yards or on the rip track, Norfolk bills the owner for the labor, parts and materials. Norfolk also accounts for such items and costs for repairs on its own cars.

22.     A rip track gang leader such as Plaintiff had varied responsibilities, which included employee line-ups, tool inspections, safety inspections, work monitoring, logging in all cars coming to the car shop, and releasing cars once repairs were completed. As gang leader Plaintiff would report to work twenty minutes early, leave twenty minutes later, and earned approximately $600 per month in additional pay.

23.    At the times material to this action, the Norfolk Car Department management in Birmingham was, in relevant part:

- Division Manager Mechanical Operations, Steve Moore;
- Senior General Foreman T. R. Wynne, Jr. ("SGF Wynne"), the senior Norfolk official over the Birmingham Car Shop;
- General Foreman J. C. Murphy ("GF Murphy"), the Norfolk "second in command" official of the Birmingham Car Shop.

24.    Before December 2015, each rip track shift had a repair bill writer, who handled all the repair billing functions. Plaintiff and other rip track gang leaders had not done such car repair billing. On or about the first week of December, 2015, the repair bill writer's position on each shift was abolished and the repair billing duties were added to the rip track gang leader duties. A two to three hour training class for the Express Yard (the billing system) billing for gang leaders was arranged by GF Murphy. Plaintiff attended the training, but was only able to stay about 40 minutes and could not finish it because of his rip track duties.  GF Murphy knew of and approved of his departure.  Plaintiff never received any further retraining on the Express Yard billing system.

25.    GF Murphy recognized the need, because of the greater billing work load on first shift, to provide additional help for the billing process, and promised Plaintiff such help would be provided.  The promised help was never provided.

26.    Norfolk management, including GF Murphy, knew that all repaired

freight cars would not get billed on the shift on which the car repair was completed. Norfolk management recognized this and instructed the rip track gang leaders, including Plaintiff, that if and when such bills had not been completed, to notify the next shift repair track gang leader, so that gang leader could finish the billing, and to provide notice to GF Murphy.  GF Murphy gave guidance on December 6, 2015 that bills were not required to be completed on the shift in which the repair was finished, but Norfolk management wanted to insure that all billing was done on a daily basis. All the rip track gang leaders had the same billing issues as Plaintiff.

27.     For many years, and at all times relevant to this complaint, Plaintiff was the local chairman of the Brotherhood Railway Carmen, elected by the members, for the Norfolk Alabama Division Carmen, which included Norris Yard where he was working.  In this capacity he was the representative for carmen employees in any discipline matter involving such carmen, he was the liaison between management and the carmen craft workers, and he was involved in matters such as work assignment and changes and safety issues.  In this capacity, Plaintiff would often be called upon to relay concerns and complaints to local management to attempt to resolve those issues and problems.

28.     At all times relevant to this action, Norfolk management including SGF Wynne and GF Murphy were pushing and coercing employees to (a) produce more

foreign line car repair billing, (b) reduce train delays caused by mechanical problems, (c) reduce the number of occasions on which bad ordered freight cars had to be removed from trains in the departure yards, and (d) reduce the time required for bad order cars to move through the rip track for repair and release back to the Transportation Department ("bad order dwell time.")

29.     On information and belief, Norfolk had a bad order car count quota for each of its yards, including Norris Yard, and management such as SGF Wynne and GF Murphy, were evaluated on their performance on this measure. They were also evaluated on bad order car "dwell time", which was the time a car was at the rip track awaiting repair and release. Again, management evaluated local supervisors such as SGF Wynne and GF Murphy on their statistics in this area. These, and other performance metrics, were important factors in Norfolk supervisor's pay, bonuses, assignments, and, promotion opportunities.

30.     Norfolk Birmingham management noted above made it very plain that they did not want bad order cars being found or moved to the rip track.  There was a great deal of pressure placed on employees about not having bad orders and this adversely affected employee morale. Carmen felt pressured to let cars go without bad ordering them so that the bad order count and bad order dwell time, among other statistics, would look better for management.

31.    Freight car safety standards and air brakes tests are regulated by certain federal statutes, including the FRSA, and the Federal Railroad Administration ("FRA"). The inspections and repairs of any FRA car defects and the air brake tests are governed by these federal laws and regulations and Norfolk rules. It would be statutory, regulatory, and Norfolk rule violations not to inspect and/or air brake test cars and trains. It would also be violations to find a defect and not tag and repair it. Norfolk management was, actually and in effect, by its actions as aforesaid, coercing carmen into violating federal laws, regulations and Norfolk rules.

32.    The coercions and actions noted above created serious safety problems for employers and the public. The coercions and actions noted created a hostile and less safe workplace for carmen and other Norfolk employees.

33.    The pressure not to tag bad order cars was compounded by discipline problems created when a bad order car would be found later by another carman, management, or an FRA inspector. Norfolk local management would then charge and punish other carmen who had, pursuant to the pressure applied, not written a bad order tag for the car.

34.    Punishment for the infractions noted in paragraphs above were disproportionately and illegally levied against African-American carmen as opposed to Caucasian carmen.

35.     Norfolk improperly and illegally targeted African-American employees in the Car Department by using the discipline system in an illegal, retaliatory, and discriminatory fashion to discriminate against African-Americans, as aforesaid. This illegal misuse of the discipline system adversely affected employee morale and created a hostile work environment and made the workplace less safe.

36.     The improper pressure to not find bad orders in violation of Norfolk and federal safety rules, the misuse of the discipline system and the illegal, racial discrimination, harassment and retaliation adversely affected employee morale. The lowered morale and hostile work environment constituted safety concerns and hazards.

37.     The misuse of the discipline system for the reasons noted above had reached a point that in December 2015, Plaintiff raised these concerns within his union to his higher representative, Mr. Carl Lakin ("Lakin").

38.     Lakin took Plaintiff's reports and complaints to Norfolk and arranged a meeting in Birmingham, Alabama on December 8, 2015 which was attended by DMMO Moore; SGF Wynne; GF Murphy; two Norfolk Labor Relations Representatives; Lakin; Plaintiff and others.  The subject of this meeting was the misuse of the discipline system, racial discrimination, harassment and the hostile work environment, all as aforesaid. Plaintiff and the union representatives further

reported, among other things, that the discipline misuse and racial discrimination as described, were creating a hostile work environment and were creating unsafe working conditions. Plaintiff raised all of these issues and reported them to the Norfolk management and Labor Relations official listed at this meeting. These reports were protected activity within the meaning of FRSA § 20109(b).

39.     GF Murphy, on December 9, 2015, the day after Plaintiff reported the discipline system misuse, the bad order car issues and the racial discrimination, began writing, unbeknownst to Plaintiff, email memos to himself in which he criticized Plaintiff's job performance.

40.     GF Murphy did not tell Plaintiff about these memos or the contents thereof; he made no criticism of Plaintiff's work to plaintiff; he did not counsel Plaintiff about his work; and, he did not try to correct any alleged deficiencies or problems with Plaintiff's work, until January 11, 2016, as will be addressed below.

41.     There was no real or effective change in the SGF Wynne's and GF Murphy's attitudes and practices, as described above, and the work environment continued to get worse and less safe.

42.     Plaintiff did not have any counseling or criticism by Norfolk management about his job performance until he got a letter on January 11, 2016, which referenced a "conversation" of that same day. The letter purported to be about

requirements and importance to properly code, report and handle bad order cars moving across the rip track for repairs. The letter also stated that safety was the first importance in discharge of duty when performing any task as an Norfolk employee and foundation of Norfolk safety process or the rules by which all Norfolk employees should operate. GF Murphy went on to say that obedience of the rules was essential to safety. The letter stated that it was "counseling". Plaintiff had not been told prior to getting the letter that day that he was being counseled in any way. The part of the letter concerning coding, reporting and handling of bad order cars was a shock to the Plaintiff. GF Murphy had not counseled Plaintiff on January 11, but had merely reminded Plaintiff that it was important to Norfolk that billings be done properly so that Norfolk could get paid for the repairs they did.

43.     On January 20, 2016, an anonymous caller reported to the Norfolk EEO office that SGF Wynne had made a racial remark about African-American employees. Furthermore, the anonymous caller stated that African-American employees were being terminated for rule infractions while Caucasian employees were only being given time off.  The discriminatory and inconsistent discipline was creating problems in the car shop and "the work atmosphere was like a powder keg."

44.     As part of Norfolk's investigation of this anonymous complaint, Norfolk EEO officer Eliza Clous ("Clous") spoke by telephone with Plaintiff on January 25,

2016, about the situation in Birmingham. Plaintiff reported to Clous:

- He reiterated that black employees were targeted and disciplined more harshly than Caucasian employees;
- That carmen had heard SGF Wynne threaten to fire any employee who reported him (Wynne) to EEO;
- That employees feared retaliation so they would not report these problems to management or EEO;
- That a carmen, Jeff Jones, who is Caucasian, had told him that SGF Wynne had told him (Jones) that he was going to fire all the "N_ _ _ _ _ _" (racial slur);
- That carmen David Shearrer ("Shearrer") had reported to him that SGF Wynne, while at Shearrer's workplace in McCalla, Alabama, had told him that he had "three down and eighteen more that's useless to him (Wynne) to go".

On information and belief, SGF Wynne meant black employees when he said "useless", that the "three" referred to three black employees who had just been terminated or charged with rule violations, and that the "eighteen" referred to eighteen African-American employees on the carmen's seniority roster. This was, again, a report of unsafe conditions and work hazards and was protected activity within the meaning of FRSA § 20109(b).

45.   January 26, 2016, Clous reported the results of her inquiries into the Birmingham situation to Norfolk Assistant Vice President Mechanical Whitehead who committed to discuss the problems with Norfolk Director Car Maintenance Rennie Wilson ("Wilson") and Norfolk Vice President Mechanical Don Graab

14

("Graab"). Wilson and Graab were SGF Wynne's and GF Murphy's superiors in the Norfolk corporate system.

46.     On information and belief, on January 29, 2016, the Norfolk EEO office was notified that an anonymous letter had been sent to Norfolk which reiterated the allegations of the previous anonymous caller, as aforesaid.

47.     On February 4, 2016, Wilson interviewed, with Clous taking part by speaker phone, Plaintiff, Shearrer, SGF Wynne, and GF Murphy, each separately. Plaintiff again reported the hostile work environment and racial harassment and discrimination and retaliation to these Norfolk officials, as he had done previously. This was, again, a report of unsafe conditions and work hazards and was protected activity within the meaning of FRSA 49 U.S.C. § 20109(b).

48.     Plaintiff's reports to Norfolk management of the improper pressure to not tag bad orders, the misuse of the discipline system and the illegal, racial discrimination, harassment and retaliation were reports of safety hazards, and unsafe working conditions, a hostile work environment, and were protected activities as defined in the FRSA, 49 U.S.C. §20109(b).

49.     On February 5, 2016, Clous received another complaint reflecting similar allegations about race and the discipline system from Birmingham carman Derrick Hunter.

50.     On February 5, 2016, the day after the February 4 interviews, which included Plaintiff, Wilson, counseled SGF Wynne and GF Murphy regarding their poor leadership skills.

51.     As a result of Plaintiff's disqualification as rip track gang leader, he lost at least $600 per month in additional pay, along with benefits, including retirement credits, from the date of the disqualification on February 12, 2016, until he retired on November 1, 2016. The main reason Plaintiff elected to retire then was his disgust with the situation in Birmingham, especially considering that GF Murphy was not disciplined or moved from Birmingham, and also that he feared further retaliation.

52.     SGF Wynne removed, or disqualified, Plaintiff from his gang leader job on February 5, 2016. GF Murphy attended the meeting. This was an adverse action within the meaning of FRSA and was done, in whole or in part, as a result of Plaintiff's having engaged in the protected activities noted above.

53.     On February 20, 2016, Birmingham Mechanical Department Supervisor trainee, Kevin Harbin ("Harbin"), who is Caucasian, overheard SGF Wynne use the word "n _ _ _ _" (racial slur) while SGF Wynne was talking to GF Murphy on a company telephone. Harbin was in the office and GF Murphy had turned on the speaker phone.

54.     On information and belief, Harbin reported this incident to other Norfolk

management, including SGF T. L. Wilkins ("Wilkins"), Macon, Georgia, and SGF Terry Williams of Atlanta, Georgia. Harbin knew Wilkins and Williams, who are both African-American, from their prior assignments in Birmingham, when Harbin had worked for them.

55.     On information and belief, a meeting was arranged for Harbin to report this to Norfolk upper management. Harbin met in Atlanta with Wilson and another high level official, Jamie Williams on February 29, 2106. Wilkins and Terry Williams went with him. Harbin reported to Wilson and Jaime Williams what he had heard and about the racial situation in Birmingham.

56.     On information and belief, Harbin resigned from his company official position on March 1, 2016, and returned to his carman's job.

57.     On March 8, 2016, on information and belief, Clous and Wilson conducted in-person interviews in Birmingham. Jones was reluctant to speak to them for fear of losing his job. In spite of Wilson's and Clous' assurances there would be no retaliation, Jones told them he loved his job, had to do whatever he could to keep it, and, therefore, he did not want to participate further.

58.     On that same date, Clous and Wilson interviewed Harbin, who repeated his report that SGF Wynne used the n-word on the call with GF Murphy. He also told them that GF Murphy had told him (Harbin) on his first day as a supervisor that,

because they were supervisors, they did not have to follow the rules.

59.    On March 8, 2016, EEO officer Clous interviewed Mechanical

Supervisor, a company official, Kevin Harbin, who reported that he heard SGF

Wynne use a racial slur during a February 20, 2016 telephone conversation.

60.    Norfolk Equal Employment Opportunity Policy, states:

> It is the policy of Norfolk Southern Corporation
> ("Corporation") to comply with all applicable laws,
> regulations, and executive orders concerning equal
> opportunity and nondiscrimination, and to offer
> employment, training, remuneration, advancement, and all
> other privileges of employment on the basis of
> qualification and performance regardless of race, religion,
> color, national origin, gender, age, status as covered
> veteran, sexual orientation, gender identity, and presence
> of a disability, genetic information, or any other legally
> protected status.
>
> Employees and applicants shall not be subjected to
> harassment, intimidation, threats, coercion, or
> discrimination because they have engaged in or may
> engage in: filing a complaint; opposing an unlawful
> practice; assisting, testifying, or participating in an
> investigation, compliance review, proceeding or hearing
> related to federal, state, or local laws requiring equal
> opportunity; or inquiring about or discussing pay.
>
> The explicit intention is to assure equal treatment and
> opportunity for all employees and employment applicants
> beyond simple compliance with the letter of civil rights
> legislation, and to make every effort through affirmative
> action to comply fully with the spirit of equal employment
> opportunity.

61.     Norfolk Operating, Safety and General Conduct rules also prohibit the conduct prohibited in the Norfolk Corporate Equal Employment Opportunity Policy.

62.     It is Norfolk's policy and position, as expressed by GF Murphy, that safety is the first importance in the discharge of duty when performing any task as an employee for Norfolk Southern. Further, it is Norfolk's policy and position that the foundation of Norfolk's safety process is the rules set forth by which Norfolk operates and that obedience to these rules is essential to safety and willingness to obey the rules is necessary in order to remain in service.

63.     Norfolk's, SGF Wynne's and GF Murphy's adverse actions, all as aforesaid in this complaint, violated the Norfolk Equal Employment Opportunity Policy and Norfolk rues, as quoted in Paragraphs 51 and 52 above.

## B.     RACE DISCRIMINATION AND RETALIATION

64.     Plaintiff re-alleges and incorporates by reference paragraphs 1-63 above with the same force and effects as if fully set out in specific detail herein below.

65.     Plaintiff was hired as a Laborer with the defendant on February 1, 1979 in the Mechanical Department. He was promoted to carman. Plaintiff has continuously been assigned to Norris Yard since May of 1985.

66.     From 2015 until the plaintiff's discriminatory demotion (February 12, 2016), he held the position of Carman Leader (Gang Leader) on the repair track (rip

track) where he supervised a crew of six to eight day-shift Carman assigned to inspection and repair railcars that have been classified as "bad ordered" in the receiving or departure yards. The plaintiff performed this job for approximately two years in a satisfactory manner.

67.     For many years, and at all times relevant to this complaint, Plaintiff was the local chairman of the Brotherhood Railway Carmen, elected by the members, for Norfolk's Alabama Division carmen, which included Norris Yard where he was working.  In this capacity he was the representative for carmen employees in any discipline matter involving such carmen, he was the liaison between management and the carmen craft workers, and he was involved in matters such as work assignment and changes and safety issues.  In this capacity, Plaintiff would often be called upon to relay concerns and complaints to local management to attempt to resolve those issues and problems.

68.     The plaintiff began to receive reports from African-American employees that the defendant was treating Caucasian employees more favorably than the African-American employees with respect to disciplinary actions and terminations. For example, an African-American employee can commit the same infraction as a Caucasian employee and the African-American employee will be terminated and the Caucasian will receive a suspension and be able to return to his job.

69.     The plaintiff informed his higher union representative, Mr. Carl Lakin, on December 1, 2015, of his concerns about racial discrimination, harassment and the hostile work environment along with the discipline issues.  Mr. Lakin took these concerns to defendant at that time and Senior General Foreman, Tommy Wynne, and General Foreman, Jordan Murphy, started their "paper trail" creation against the plaintiff because of his complaints.

70.     In or around January 2016, the plaintiff asked for a meeting with the Norfolk Internal Labor Relations Department to discuss the complaints of the African-American employees. Tommy Wynne, attended the meeting wherein the plaintiff requested a meeting.

71.     After the plaintiff did not receive a response from the NS's EEO Department, he made a formal complaint to Ethics and Compliance Officer Elisa Clous the last week of January 2016.  The plaintiff met with Vice President Mechanical Rennie Wilson and Clous on February 5, 2016 regarding the racial discrimination, harassment, hostile and unsafe working environment in Birmingham for the African-American employees.  At this time, Mr. Cooper had not been disqualified from his gang leader position.  He was discussing these issues with the defendant as the local union representative and as a member of the adversely affected class.

72.    Approximately two weeks later, the plaintiff received a counseling by certified mail from Tommy Wynne.  Said discipline stated that the plaintiff was being demoted and it listed infractions dating back to December of 2015.

73.    The plaintiff had not been told of these deficiencies prior to making the complaint of race discrimination.

74.    The demotion resulted in a reduction in pay.

75.    During the course of the defendant's investigation of the race complaints made by the plaintiff, Caucasian employees began to tell the plaintiff that management was using racially derogatory language about the African-American employees.  The plaintiff was told that Tommy Wynne stated that he was going to "fire all the Niggers in Birmingham" of he had fired one "Nigger (Casey Sellers) and he would get the rest."

76.    Furthermore, management told Caucasian employees that there was going be eighteen (18) vacancies in Birmingham, which is the number of African-Americans in Birmingham who have seniority rights.

77.    The reason(s) for the plaintiff's termination were pretext for race discrimination along with retaliation for his complaints of discrimination.

78.    The plaintiff was discriminated against because of his race in discipline, demotion and reduction in pay.  The plaintiff was also retaliated against for making

complaints of race discrimination in that he was demoted for his complaints.

79.     The plaintiff seeks to redress the wrongs alleged herein and this suit for back-pay plus interest, an injunctive and declaratory judgment is his only means of securing adequate relief.  The plaintiff is now suffering and will continue to suffer irreparable injury from the defendant's unlawful policies and practices as set forth herein unless enjoined by this Court.

## VI.   *PRAYER FOR RELIEF*

WHEREFORE, the plaintiff respectfully prays that this Court assume jurisdiction of this action and after trial:

1.     Issue a declaratory judgment that the employment policies, practices, procedures, conditions and customs of the defendant are violative of the rights of the plaintiff as secured by 42 U.S.C. §2000e *et seq.* and 42 U.S.C. §1981.

2.     Grant plaintiff a permanent injunction enjoining the defendant, its agents, successors, employees, attorneys and those acting in concert with the defendant and at the defendant's request from continuing to violate 42 U.S.C. §2000e *et seq.* and 42 U.S.C. §1981.

3.     Enter an order requiring the defendant to make the plaintiff whole by awarding him the position he would have had occupied in the absence of race discrimination, retaliation, back-pay (plus interest), front-pay, punitive and

compensatory damages and/or nominal damages, declaratory and injunctive relief, and benefits.

    4.    The plaintiff further prays for such other relief and benefits as the cause of justice may require, including but not limited to, an award of costs, attorney's fees and expenses.

                Respectfully submitted,


                Gregory O. Wiggins
                Kevin W. Jent
                WIGGINS, CHILDS, PANTAZIS,
                      FISHER & GOLDFARB, L.L.C.
                The Kress Building
                301 19th Street North
                Birmingham, Alabama 35203
                205/314-0500
                205/254-1500 (fax)


                William C. Tucker, Jr.
                Maples, Tucker & Jacobs, LLC
                2001 Park Place North, Suite 501
                Birmingham, Alabama 35203
                205/322-2333

                *Counsel for the Plaintiff*

compensatory damages and/or nominal damages, declaratory and injunctive relief, and benefits.

4.     The plaintiff further prays for such other relief and benefits as the cause of justice may require, including but not limited to, an award of costs, attorney's fees and expenses.

Respectfully submitted,

_Gregory O. Wiggins_
Kevin W. Jent
WIGGINS, CHILDS, PANTAZIS,
        FISHER & GOLDFARB, L.L.C.
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
205/314-0500
205/254-1500 (fax)

William C. Tucker, Jr.
Maples, Tucker & Jacobs, LLC
2001 Park Place North, Suite 501
Birmingham, Alabama 35203
205/322-2333

_Counsel for the Plaintiff_

PLAINTIFF DEMANDS A TRIAL BY STRUCK JURY

OF COUNSEL

24

**DEFENDANT'S ADDRESS:**
To Be Served Via Certified Mail -

      Norfolk Southern Corporation
      Operating Subsidiary Norfolk Southern Railway Company
      c/o Crawford S. McGivaren, Jr.
      Cabaniss, Johnston, Gardner,
          Dumas & O'Neal, LLP
      2001 Park Place North, Suite 700
      Birmingham, Alabama 35203